The next case called for oral argument is Rogers-Cartage Co. v. Travelers Indem. Counsel? May it please the Court. My name is Danica Bornek and I represent the District of Insurers in this case, the Travelers Co. This case is fundamentally about Travelers' contractual right to have its insurance policies enforced as written and not to be forced to pay for an unfair settlement. While there are multiple errors in the trial court's decisions that require a reversal, here in my 20 minutes today, I want to focus on three. First, the stopple. It was reversible error for the trial court to find that Travelers breached its duty to Rogers and the trial court both acknowledged that Travelers fully defended Rogers and allowed Rogers to control its own defense. Travelers never took over Rogers' defense and Rogers has not demonstrated any prejudice caused by anything Travelers did to provide the defense Travelers provided. Second, the pollution exclusion. The trial court also erred in finding that the pollution exclusion in certain Travelers' policies did not apply here. The pollution exclusion provision of the Travelers' policies excludes expected or intended discharges from coverage. The focus is on whether the discharge was expected or intended, not the damage. The record is uncontested that Rogers expected and intended to discharge chemical keel and rinsing onto the ground at Cahokia and into the sewer system at Sanjay, causing the damage from those discharges to be excluded under the Travelers' policies. Rogers' arguments in response that the so-called container exception applies should be rejected because no such exception currently exists under Illinois law. And even if it did, the trial court should have denied some re-judgment because there are questions of material fact as to whether the ground at Cahokia or the sewers in Sanjay were containers designed to contain pollutants. Third, and finally, collusion. It was reversible error for the trial court not to find there were questions of fact as to whether the settlement was unreasonable and or collusive, precluding some re-judgment. Excuse me. Is it Vobornik? Vobornik. Okay, thank you. Ms. Vobornik, I'm interested in what effect you think, if any, the order by Judge Flynn has in this case. Do you think that this court should look to that and give it any credit or credence? Judge Flynn, at the outset of the case, by way of background, indicated there was a foreign student and he indicated that the way the case would be divided would be that issues related to sort of the settlement would be within his purview and issues that were more local in nature would be down in St. Clair. However, the St. Clair case started to advance ahead of the Cook County case, which was slower. And in our estimate, one of the issues that Judge Flynn had was collusion. Right, that's why I'm interested in that. The record shows that, right? But nonetheless, my opponents will argue that collusion was argued downstate. But Judge Flynn made a finding that there was no collusion. But Judge Flynn didn't have a hearing on collusion. Judge Flynn didn't. Has that ever been appealed? No, because it was after it was consolidated into this case upon when the issues had advanced ahead in St. Clair County, including the issue of collusion, and Judge Flynn endorsed from both the St. Clair County's decision on collusion, that left nothing apart from lost policies, which are a sub-issue and still in Cook County. It really left nothing. So Judge Flynn re-evaluated the form nine portion of the case and transferred the totality of it to St. Clair. But he made, Judge Flynn made some findings that are very specific. Specifically, I'm concerned about this one, where he says, as a factual matter, Rogers did not conceal settlement discussions from travelers. He must have had something upon which to base that. Well, I mean, there was a briefing done, most certainly. There was no argument with respect to the briefing that was done. Well, in the First District, even in the courts, I understand they don't argue a lot, every motion. But I am concerned about some of those findings and how we should treat them down here, because basically our court agreed. Right? Well, first, it wouldn't be Judge Flynn's protocol to have a hearing on settlement. On every other issue, Judge Flynn has a hearing. He didn't have a hearing on that. Rather, he reviewed what had happened in St. Clair. And St. Clair made its decision on an incomplete record. That's travelers' position. So upon that, what we did was we refiled the briefs after the fact. The county briefs in St. Clair County. But there was no hearing in any of the courtrooms. With respect to the very fast and intensive issue. So was the briefing complete in Cook County when Judge Flynn made the finding? Was it complete? Complete. Yes, I'm sorry. Voice. No, the case was still ongoing in that there were issues that are unrelated here, that were still open issues. So we should not look to Judge Flynn's findings because, in your opinion, he made them when the record was incomplete. Well, his finding is specific, I would agree, but it's not detailed. And it certainly doesn't address the issues of collusion. But we also argue that the St. Clair court failed to consider, which will be part of my argument, particularly all the issues in the Tracy's Treasurer's case. So you can, I presume you would consider Judge Flynn's order, but it is no more correct, certainly, than the St. Clair court. Were the issues, I'm worried about the issue of estoppel, which I didn't see a lot of people really arguing about with regard to Judge Flynn. In other words, you've got the same parties, the same issues, you've got the judge making some specific factual findings, and I'm wondering if travelers is estopped to raise what he wasn't correct, you know, those kinds of things in this court, whether we really have to look at that when we make our decision about what Judge Rudolph did. Does that make sense? The two came to the same conclusion, so I don't understand how one would estop the other necessarily. So your argument is that basically they were both wrong for the same reason. True. And I would say Judge Flynn was even perhaps additionally wrong to the extent there was no specific hearing or any evidence of any evaluation of, for instance, the Tracy's treasurer's factors at all. And I would also say the St. Clair situation was objectionable for reasons that the record on collusion wasn't even in front of him, the briefing on collusion wasn't in front of him when he issued his initial decision with respect to the subject of collusion. The word collusion was counted in the transcript. At the hearing where it was decided collusion was uttered, the word collusion was uttered something like 33 times or some number of times. Three of them were by me, and 30 or so were by my opponents. And the three times I said it were the times when I said, this is something that Judge Flynn has reserved for his own consideration not to be considered here. So that was the extent of my argument anywhere on collusion. On collusion, and this will be the third point of the argument, it was reversible error for the trial courts not to find there were questions of fact as to whether the settlement was unreasonable and or collusive precluding summary judgment. Illinois law provides a list of red flags that are indicators of an unreasonable or collusive settlement, and here numerous of those red flags of unreasonableness and bad faith are present. But even before you get to those specific red flags, the reasonableness and collusiveness of a settlement must be called into question when Rogers had its secret $7.5 million Plan B settlement regarding targeting all of travelers' policy limits all planned out unbeknownst to travelers even before presenting the $4 million Plan A settlement to travelers. Reasonableness is quintessentially an issue of fact, and the red flags of this settlement create issues of fact that should have precluded the trial courts from granting Rogers summary judgment. Okay, now let's dig into my remaining time. I want to dig into these three issues in more detail. I'm starting with estoppel. Under Illinois law, an insurer can be estopped from asserting policy defenses if an insurer breaches the duty to defend its insurant. There are two kinds of estoppel in Illinois, contractual estoppel and equitable estoppel, and neither one applies here. Under Illinois law, there is no contractual estoppel where an insurer defends under a reservation of rights or files a timely declaratory judgment action. Here, travelers did both. Travelers defended Rogers under a reservation of rights from 2000, when the underlying case was filed, to 2011, when Rogers settled the underlying case and the case was dismissed. Travelers paid for every penny of that defense, while allowing Rogers to control its defense throughout. Travelers paid for two sets of lawyers of Rogers' choice, paid for experts, paid for Rogers' 2003 trial against the government, and paid for Rogers' lawyers to negotiate the very settlement that Travelers was contesting for section. Even after Travelers learned of Rogers' settlement of claimants, Travelers confirmed in an April 2011 letter that it would continue to defend Rogers, and Travelers did so until the underlying case was dismissed. And Travelers fully defended Rogers, even though Travelers contested its indemnity applications to Rogers. It simply cannot be seriously argued that Travelers breached its duty to defend under these facts. The other type of estoppel, equitable estoppel, does not apply here either. For equitable estoppel to apply, the insurer has to show by clear and convincing evidence that it was prejudiced by the insurers usurping control of the insurer's defense. First, Travelers simply never took over or usurped Rogers' defense, which Rogers admits. Second, Rogers has no evidence of prejudice. What about the letter that says if you settle, you settle at your own risk? It's a letter. Do you think that's not withdrawing your defense? Absolutely not. That very same letter says in its body that we will continue to defend you, and Travelers did continue to defend them after that. Well, the point of that letter was you thought you were paying for your defense costs, but you thought you were in control of this case, and you're not anymore, and you proceed further at your own risk. That was the import and the intent of that letter, wasn't it? No, I think where I differ with Your Honor is that the import of that letter was that if you enter into this particular settlement, which is an amount that exceeds the Travelers' limits and which is an amount that is in excess of the appraisals Travelers have received with respect to what a reasonable settlement should be, you are doing that at some peril. And while the letter said we have the ability to control the defense, it never took over the defense. If you look at the record, Rogers had a plan, and they had a plan all along, and they had a plan with two settlements, a $7.5 million settlement, the one we're here talking about, and they had a $4 million settlement originally. Travelers didn't know anything about that. They planned to settle the underlying case regardless of what Travelers did. Travelers sent this letter, nothing changed. What was the timing of the letter as opposed to the agreement that was entered into, in your words, secretly? They were drafting both agreements, the $4 million one and the $7.5 million one. They had both in hand. The only one they advanced to Travelers was the $4 million one. Back here, when they were doing that, the other thing they were doing is they were drafting a complaint to file against Travelers. And one of the numerical characteristics of that complaint is that there was an allegation, and furthermore, Travelers has failed to file a loss of a coverage loss to a DJ, which is just simply a little ironic because now they criticize Travelers for having filed a DJ. So the draft complaint said that before you ever got notice of the $4 million. Right. We get the $4 million letter. They had already, before we got that letter, told the judge, this case is going to settle one way or another, with or without the insurers. It's going to settle. And sure enough, the litigation did not continue after the letter. The case settled, further agreement, same agreement, same essential terms. We've been talking about that here. And the letter had zero impact. It didn't have an iota of impact on what their plan was from day one. And that was in the federal court. Pardon me? The settlement was in the federal court. The settlement was amongst them, and they went to the federal court and had it endorsed for purposes of, it's entered so as to protect the parties that enter into a settlement like that from contribution claims. It was entered. There was no hearing with respect to the reasonableness of the settlement before Judge Murphy, and there was certainly no reasonableness hearing as it requires that an insurant enters into a settlement with the insurer and is seeking to use the insurer's money. That's a different kind of reasonableness. That's a standard. That's a test that has to be engaged in to decide if a prudent uninsurant would enter into that same settlement. Is it reasonable from those aspects, from an uninsured person, and is the amount that they agree to pay and the time that they agree to pay it reasonable? Because regardless of anything the travelers did, anything, travelers are still, at the end of the day, entitled to that protection of the reasonableness of the settlement. I understand. But this letter that you wrote that seems to be the focus of the court, you meaning travelers, there was some suspicion, obviously, by travelers that something was going on. How did that happen? There was suspicion because it was, we got sort of an indication through reports from House of Lame that if we got a settlement, we would hear from it. We would hear about it. We knew they were meeting. We heard that they were not pursuing discovery in any meaningful way in the district court, the federal court. There were just indicators. No one ever told travelers directly, but even with respect to the $4 million demand, despite the fact that there were these two, the 7.5 and the 4, even in the face of the $4 million, there was a meeting about the $4 million, and travelers needed to make it clear. Travelers was warning Rogers that you proceed with this $4 million settlement, and there may not be enough coverage to cover this. You have $300,000 roughly of insurance policies that don't have a pollution exclusion. They're not entitled to the $4 million. So if they went ahead and settled for the $4 million, travelers needed to make sure that Rogers understood the risk that they were taking if there wasn't coverage under the policies that clearly exclude pollution for discharges in this case, which is $7 million worth. But only a DEC action would have determined that. Which is why we filed a DEC action. And the timing of the DEC action was the same day as what? The timing of the DEC action was completely in accord with Illinois law, particularly when you consider that the DEC action was the suspenders part of a belt and suspenders approach to a situation where travelers had been already defending Rogers for a decade and had already spent millions of dollars defending Rogers and had said we will continue to do that. How can it be reasonable under those circumstances to settle that case, the second case or the second phase of the case, having taken no discovery, having filed no motions, having done nothing to pursue contribution claims? It made no sense at all. Do you remember what date you filed the DEC action? Oh, yeah, December 30th. So the same day that you wrote the letter, you filed the DEC action. Is that true? I believe it. You filed it the day after the letter. Very close in time. Okay, very close in time. So there was really no significant delay there. There was no delay there, and Illinois law is that you have to have it filed before the adjudication of the matter. We were within the law of the timing of when you need a DJ, but I'm going to step it back to a DJ wasn't even necessarily required here when we were already defending, and we had said in the letter, and we will continue to defend. There was no question, and no one has ever said that we weren't defending all along. Well, there was a letter by Amanda Schultz,  But the letter, at least according to the Rogers folks, is that travelers ignored the advice of Mr. Schultz, that Rogers was exceptionally exposed in this particular case, and that only on appeal, perhaps, could Section 107 be thrown out. So it seems that that's also a focus of why there wasn't a settlement in good faith by travelers. You offered $275,000 or whatever. We offered the quality of our non-collusion exclusion limits. That wasn't an arbitrary number. Right, but you had a letter from a pretty well-respected lawyer. The letter says on its face, with respect to this claim, I need this one before I'll need it again. With respect to this claim, there's more evidence that would need to be pursued. There could be some risk on that particular aspect of the claim. It's the way they divvied up the various pathways to the vet creek. But there was some potential of exposure on that particular one. And then it said, we probably could settle this in Rogers' interest for $2 to $3 million. Keep in mind, Rogers has no money, but I would expect that I would beat that, the whole thing, on appeal. Travelers is permitted to factor all that in. What shouldn't be factored in is any consideration with respect to the financial viability of Rogers. Doesn't that letter indicate from Mr. Schultz that his client, Rogers, could not financially sustain losing this case and the bond and taking it on appeal? That it would destroy the company? You know, that's an unfortunate fact that a claim could destroy a company, but that doesn't change the limits of insurance policies. But does it change the position of travelers saying, oh, we're defending you, oh, but by the way, we're taking these actions, and saying you go past this point in your peril, and we are changing our position on the availability of prior coverage, which I know have been raised by travelers as an issue, and you go past this point at your peril, we may still finance some of this, but we're also filing a deck action. Right. Those could be construed by a court looking at the reasonableness of a settlement as somewhat coercive actions by an insurer against the interest of its insurer, couldn't it? No, I wouldn't agree. Because it's not the insurer's obligation to pay a settlement amount in excess of its limits. I'm not asking about the limits. I'm asking about the totality of the actions of the insurer in relationship to its insurer and whether a judge, as in this case, considered that those were actions prejudicial to its insurer and justified the actions the trial court took in this case. I don't think so at all. And I think that the reason, the proof of that is the fact that, as I laid out the chronology of things, their strategy with respect to what they were going to do here didn't change at all by virtue of Traveler's Letter. Nothing changed. I don't believe there are any more questions. Thank you, Counsel. Thank you. Counsel? Good morning. May it please the Court, Ron Hobbs on behalf of Rogers Carthage. The Area 1 lawsuit was an action to determine who would pay for a major environmental cleanup in Sojay, Illinois. In 2000 and in 2003 and in 2010, Traveler sent letters to Rogers, each time telling Rogers to act in any manner that would best protect its interests. And it also told Rogers that Rogers could settle the case without violating any terms of the policies. But then, in the 11th hour of the case, on December 30, 2010, Traveler wrote to Rogers again, this time warning Rogers that Travelers and only Travelers would consider settling. And that, quote, so there is no misunderstanding, Travelers does not consent to Rogers' unilateral settlement negotiations. This was not a reservation of rights letter, as Travelers now argues, nor is it true that Travelers had no issue with Rogers settling, as it claims in its brief. As you suggested, Justice Goldenherz, the words and intent of this letter are clear, and so is the follow-up letter from April of 2011, which says, quote, despite Travelers' admonitions, Rogers has apparently conducted settlement negotiations without the involvement or consent of Travelers. Rogers is on notice that it breached the Travelers' policy. Its conduct has negated any coverage that might have otherwise been available. Travelers was trying to stop Rogers from settling or even further negotiating, and Illinois law prohibits this. If an insurance company tells an insurer to handle its own defense and that the insurer may be liable to pay the final judgment itself, the insurance company cannot at the same time dictate whether or not the insurer can settle. This is so well established that despite all the issues Travelers raised on appeal, it decided to leave this one alone. It is not argued here, as it did in the trial court, that Rogers could not settle without Travelers' consent. Travelers knows this is not defensible, which is why it tries to recharacterize its letters and its lawsuit as something other than an attempt to stop settlement. Mr. Hoffs, let me ask you a question, because I don't understand this. You have a client, Rogers, who's negotiating with the claimants. The claimants come and say, we're going to give, we'll settle for $4 million if your insurance company pays it, but, oh, by the way, if your insurance company doesn't pay it, we'll get a judgment against you for almost twice that amount, and you only have to pay $50,000, and, oh, by the way, we're not going to tell your company about that. Now, your client, even though he had the right to settle, would you agree that he has to act in good faith because he's the insurer? Isn't there some requirement that he has a good faith duty to inform Travelers of these potential settlements? There is no duty to inform Travelers. There's no good faith in this insurance contract that your client act in good faith when he settles this case? Well, that's a different question. I'm asking that question. The question is, does he have a duty to act in good faith? Act in good faith.  And then when you take... Whose duty is to his client? The attorney acting for Rogers. His duty is to his client. I'm talking about Rogers, who's a signatory to the contract. Right. I understand the question. What is his duty to Travelers? When there's a settlement reached by an insurer in an action that the insurer is controlling the defense, there are two pathways to get to indemnity of that settlement. One is, because the insurer controlled, the insurance company can still potentially raise its... whatever its coverage defenses are. That's sort of door number one. So you agree that the insurance company can still raise its defenses if the guy, the insured, settles his own case? Unless there's an assault. That's correct. But in direct answer to your question, door number two is when you, the insurer, settle your own lawsuit because you've been controlling, there's a showing that has to be made before you can get an indemnification, and that is a showing of reasonableness. That's the given case. And do you think it's reasonable for an insured to take kickbacks on the settlement? Well, I don't know that I would call it a kickback. Well, if there's a provision, if you get more than $5 million, you're going to get a percentage back. If you get more than $6 million, you're going to get a percentage back. What do you call that? Well, the provision that's in there is something that came from other settlements that are out there. It's not a new invention. In fact, it came from a Department of Justice settlement with a prior defendant in the same case about 10 years ago. But was it disclosed? I'm looking at, did your insurer disclose that at the time the $4 million settlement was offered? No. The insurer did not talk to Rogers, I'm sorry, the insurer did not talk to Travers about a potential alternate settlement at the time it was looking at. And at the time this settlement offer was made, it's my understanding, there was indeed a draft complaint already made. Well, the claimants prepared a draft complaint. Right. The idea that the parties were working together on one is not correct. The claimants prepared. Keep in mind, Judge, that the claimants were pushing for a settlement. Oh, absolutely. And so they, if they wanted the $4 million or they wanted the $7.5 million, which would entail this coverage loss, Rogers did not want an insurance settlement. That is throughout the record. They kept pushing for the cash deal. They wanted out. They wanted Travers to participate. When they got that demand through the door, the first thing that in-house counsel for Rogers said is, wait, I have to talk to my management about this. I have to hire outside coverage counsel. And eventually, about three weeks later, they said, let's send that $4 million demand to Travers. See if Travers even wants to pay the $4 million. But while all of this is happening, there's frankly no duty, because they're controlling the lawsuit. And this is the Tracy's Treasures case, which Travers sites repeatedly and it's free. There is no duty to call your insurance company and say, hey, we're defending the case. We have an offer through the door that might result in us having a delegation with you. I need to tell you about it. There is no duty to do that. And frankly, there should be no duty to sort of warn your insurance company, this may go down that road if you're defending the case on your own as the insurer. Now, Travers was aware that these discussions were going on. In fact, the very first settlement meetings were reported back to Travers, and it was disclosed to Travers in September that we have all the policy information out here and we're talking about it with them. That was disclosed. But when this offer comes through the door, you don't have to pick up the phone and call the insurance company and say, hey, we got a settlement opportunity here. We might be suing you soon. You don't have to do that, but you're controlling. Now, I understand that you're controlling. What concerns me in this case is that you had two balls to juggle. One, you disclosed expecting it really not to be accepted because what benefits Rogers the most? A $4 million payout or a judgment for $7.5 million where he actually gets money back? He only has to pay $50,000. You've limited his liability. This is an argument that Travers makes throughout his brief, that, oh, the $7.5 is baked in. This is the deal that they wanted from the beginning. That is not supported by the record. Well, it may not be supported by the record. Obviously, nobody can get inside your settlement. But why create a second settlement like that? Why do it and not disclose it?  Why not disclose it? I think it's because Rogers wanted to make sure. Rogers didn't want to sue his hearing. Everybody who was opposed says, we didn't want this insurance lawsuit. Well, even if the $4 million, wouldn't he have had to sue? Because they were only saying there was coverage of $300,000. Not at all, Your Honor. The $4 million or some small amount therefrom that Travers would have negotiated. The $4 million was a cash payment. The idea was, and you have these e-mails going from people at Rogers to Travers saying, please, put something on the table. Put the $2 million on the table. Let's get this over with. $2 million, there's an e-mail from in-house counsel for Rogers saying, look, $2 million, we think they might take it. It's good for you, Travers. It's good for us. Let's take the $2 million. Rogers did not want the insurance settlement, mainly because it was facing other potential liabilities. In Sochi, and potentially in other places. And they were about to give up, potentially, all of this historical insurance coverage, which you can't replace. There were all these fights going on in the record where Rogers is trying to pull back policies saying, we want to take these 60s policies off the table. We want to take the 70s policy off the table. There's all this correspondence going back and forth. They did not want to give up their insurance. And when it comes to reasonableness, the ultimate question, Your Honor, is how does the amount of the settlement compare with what the potential damages are? In fact, it's a two-pronged test. One is, is there a reasonable anticipation of liability? And I don't think there's any question here that there was a reasonable anticipation of liability. There are several places in the brief where Travers says, well, they had this defense or that defense. It doesn't matter if there's a defense. That doesn't create a dispute if there's a defense. You just have to settle in reasonable anticipation of liability and, as he hates to say, not act as a volunteer. The second problem, which is relevant to the question you asked, is the amount. And there are cases. Typically, for whatever reason, they tend to fall in these unsolicited facts cases, right? There are cases where they find ways to build up a settlement well beyond what it should be to try to hit all of the policies they possibly can. This Tracy's Treasures case, for example, they said, well, 40,000 people would have gotten these taxes. Let's take the ultimate penalty, which is $1,500 per, and we'll say it's a $6 million thing. And then we'll build the insurance up to a certain amount to make it look reasonable. And then when they actually figured it out, they only had, like, 5,000 people. They didn't even have the fax numbers anymore. And if you multiply that by the standard of policy, the standard of $500, it was like $4 million. And they said, that is not this case. This is a case where the damages were expected to be $30 million plus. And even if Rogers had prevailed on all of those circular defenses by limiting the share, which, by the way, is extremely hard to do, even if it did that, the lowest number that's out there, the lowest number, is $10 million. What about the fact that discovery was halted, though? I mean, can we rely on those numbers when, in fact, discovery did not commence? Absolutely. And, Your Honor, I do need to— I mean, those numbers come from the claimants. I do need to spend a little time on this because there are so many misstatements here about what the record says that, frankly, this should speak—those should speak to this court louder than any other issue in this case. They cannot make any other arguments on any major issue without repetitive, over and over again, misstatements of what's in the record. And that's a key one you identified. Give me the one on the right. Oh, sure. They say throughout their brief that Rogers settled at the very outset of the case, or the earliest possible point, or without any discovery. Tell me about what discovery was conducted. When interrogatories went out? Well, that's right. Absolutely. They—when Rod and Travis—sorry to interrupt you. When Travis came to this court asking for an extension on the brief, they laid it all out. Right? A hundred depositions had been taken in the first phase of the case. No, I'm not talking about 2003. I'm talking about when the claimants filed directly in 2010. Absolutely. Because in 2003, Rogers won. It won because the United States had most of its witnesses barred. But it won. Okay. It won. So tell me what discovery was conducted in 2010. There was no additional discovery, but a lot of work was done on the case. No additional discovery. No additional discovery. On the 2010 case. That's correct. That's correct. So the claimants—it's true, then, that the claimants who said, we have new evidence, that was never explored. It actually was, ma'am. It was explored. Tell me when it was explored. He's going to tell us it was explored. Sure. In late 2010. It was explored, but not through discovery and interrogatory. That's a red herring. There was a lot of work that was done on the case. First of all— Tell me when it was explored. Sure. Two points. Number one, when those new claims were first filed, as you mentioned, Rogers contested the motion to add those claims, and it lost. Then it filed the 12B6 motion to dismiss, and it lost. There was a motion practiced. The person who did the sampling— Were there any corporate depositions—corporate designees? Schultz. Rob Schultz. And this is in the record. Rob Schultz. Is this Robert Schultz from Peoria? No, no. Rob Schultz. Dicker Schultz. Okay. That's why I was confused about that. Schultz billed over 150 hours to preparing Rogers' defense at the same time he was discussing Sullivan. Okay. It's in the bill. I want to know where in the record I'm going to look to find out what was done to really scrub down the liability issues. Yes. The answer is A5361 to A5379. And what are they going to say? That is Rogers—that is Rob Schultz's legal bills. He spent three months, as he described, trying to find a way to win. He knew that because he had these sampling results, which are facts, by the way, they're not opinions, they're results of what's in the ground, by an expert who he had tried before to exclude on government grounds and lost. That's the one he characterized as being so dangerous? Exactly. And was that done in the 2003 litigation? The CERCLA litigation then or in 2010? It was done before. It's all the same case, Your Honor, but it was done before. It was done before. And keep in mind, CERCLA cases, this is important, CERCLA cases are judge-tried cases. There is no jury. And the judge told Rob Schultz in one of the meetings they had after his claims, he said, look, if you're looking at the hangman's noose, sometimes it's better to get hung and get it over with. Rob Schultz knew he was in trouble with this judge because of the claims. And he said, I'm getting the feeling the judge is going to rule against me. So he spends 150 hours in the same time they're discussing settlement. What was he doing? He had the sampling. So he said in his deposition, I was looking for another source. My only way out is to see if somebody else was in there on that conical property. He looked at historical records who was on the property. He looked at aerial photos. That's all in his bills, 150 hours if you count them up. It's 150 hours he spent in those three months getting ready. Now, of course, travelers don't see that. They say, well, they didn't do anything. You'll see that in their brief. They didn't do anything. And so they actually say in his brief because they know that's out there. They know that the hours are there. He put the hours in, not by serving in a riot force, but by doing his own investigation. They say that Schultz was, quote, actively misleading travelers. Did Schultz participate in the discussions of the $4 million versus $7.5 million? Initially, yes, until Coverage Council was brought in. That doesn't answer my question. Did he know about the two different settlement offers? Absolutely. And he knew about the percentages that were going to be paid back to Rogers in the event of a judgment? Absolutely. Well, and those evolved. Those evolved. But he knew about it. Oh, sure. And he never told travelers. Sure. But, of course, as I said, I don't know that he had a duty to tell travelers. But, no, he didn't tell travelers, which is a point that we were talking about before with these settlement offers. And travelers was paying him, not Rogers. Right. But his duty is to Rogers, not to travelers. I understand that. But travelers paid him. So now what you're telling me is travelers paid him, and he did do diligence of some sort in determining potential liability. Okay. So where's the vexatious refusal to defend or pay?  So that comes from the fact. He never talked about that. Right. One option is you can defend it yourself. You can come in and defend it. Now, they couldn't do that in this case because they had a potential conflict in that case. They had a reservation of rights, and they would come in only if they would hold a reservation of rights and accept that liability. But they didn't or couldn't do that. So they have to let the insurance company – I'm sorry. They have to let the insurer on their own defend the case. And the law is clear that when the insurer defends the case, you have to let them have an unfettered, full defense. You can't say you can defend the case, but when it comes time to settle it, we're going to handcuff you. We're not going to let you settle. Would you agree they didn't handcuff him, so to speak, until the December 29th or 30th letter? I would agree. So up until that letter, Travelers was paying for and abiding by the rule to defend their insurer. Right. Okay. That's correct. So December 29th or 30th is your position that all of a sudden they're not in good faith. That's correct. The letter and the lawsuit combined. Well, the other problem is if you don't defend, you have to file a decat. Initially, yes. You see. There's no timing on that except before judgment, is there? No, that's incorrect. Okay. In almost every case in Illinois, including the Fifth District, and this is your opinion, Your Honor, in courting Nojewski, it's a reasonable time test. The idea that you can wait until a day before there's a settlement of judgment and say, okay, we're going to defend now or we're going to file our decat now, that's not how the law works. They're misquoting Elko, the Illinois Supreme Court case, where in Elko they said if you do it after a judgment of settlement, it's untimely. It's a matter of law. They flipped it and said, well, if you do it before a judgment of settlement, it's okay. That's not how the law works. But you just told me that up until the letter, they were doing their job, right? As far as the duty to defend goes, yes. Duty to defend. But the dec action was filed within 24 hours after the letter, so what is unreasonable about that timing? The dec action was completely unnecessary. I know, but what was unreasonable about the timing that you just claimed had to be reasonable? The dec action was filed for an improper purpose. The dec action said, and I think it's paragraph 53 or 54, the dec action said, look, we have an insurer here who may settle the case without our consent, right? So we're filing this lawsuit to try to stop settlement, which they have no right to do. And all of the cases, for the most part, except a couple that are federal cases, all of the cases in Illinois that says you can't do that, you can't turn the control over to your insurer and then come in and say you can't settle the case, those are all first district cases. They filed a complaint the day they sent the letter in the first district saying our insurer is about to settle and we're trying to stop him. It's in the complaint. This was not, as they characterized it, to make sure they followed the duty to defend. If they wanted to follow the duty to defend, they could have just kept paying the bills, which would save them, and let the insurer do it on its own. Which would have resulted in a judgment of $7.5 million against the insurer who had agreed to cooperate to get the traveler's money, right? Yes, Your Honor. And the one thing I think I have to say, because we've sort of gotten to this point, if I can, and have not quite fully gotten there. Well, your time, unfortunately, is up. I'm not saying it's up to the judge to cut you off. Go ahead. Thank you, Your Honor. That's right. The cases where there's putting things in to make the settlement, you know, put all these illicit things, as some of these Florida cases stand, are where they're trying to build up. The $7.5 million on its own is reasonable, right? The law says you can't take a cash. There's a whole expression, what do you take for cash, right? That's what the claimants were saying. We'll take $4 million in cash, or we can do $7.5. All of that are well beneath what the potential damages were. Even on Rogers' best day, they are well beneath. And how Rogers and the claimants decide to take that money coming in, assuming it's well beneath what it is. And these are damages where the costs are known. The money's been spent to clean up. These aren't subjective or efferative at all. This is what was spent. No, I thought there was some additional money that was up to $20 million that was potential. True. That's if you go above $30 million. I'm saying that $30 million is spent. $30 million had been spent. So once you get a reasonable settlement, would you look at it on its own? And that's what the law says. That's Illinois Rule 408. You can't compare the cash settlement and say, well, if they were going to do $4 million in cash, they would take the cash. $7.5 can't be reasonable if it's insured. That's not how it works. You look at the $7.5 on its own, and it's well beneath any of these potential damages in a circle lawsuit being tried by Judge Murphy. And so when they say $7.5, and this is how we're going to split some of it up, it does not make the settlement unreasonable. Okay. Thank you, counsel. Counsel? And if you need a few extra minutes afterwards, as we're questioning you, we'll let you do that. I first want to say broadly that Traveler's Letter doesn't say you can't settle, you should never settle, don't settle. What Traveler's Letter said, the key letter here, is they said this settlement, you should not do this settlement, you should not do this settlement assuming that we're going to pay for this settlement because we're not going to pay for this settlement, number one, because our limits don't allow us to pay for this settlement, we're not obligated, and number two, because this number is too big for this settlement. It was liability and coverage. It was a warning. It didn't change anything, and they still went ahead and settled, and it was their right to settle. And they settled. It was within their right to settle, but what they couldn't do is commit an amount of money that Traveler's doesn't owe to a settlement while violating other terms, which is what they did. But when they do go ahead and settle, what we'll draw to that is a reasonableness standard with respect to that settlement. That's one of the things under the law that we're looking at, and I think we've been talking about here today, the reasonableness. Reasonableness is quintessentially an issue of fact. There was never a fact-finding exercise with respect to the reasonableness of what they did here, and I would suggest that if you take an opportunity for a 3.75 settlement and an opportunity for a $7.5 million settlement, and you choose the big number, right there, that's a Tracy's Treasurer's flag with respect to why this particular settlement has to be scrutinized with respect to reasonableness. They knew that the claimants would accept 3.75, yet they entered into the $7.5 million, and that's before you even get to the terms of it. With respect to the subject of no discovery or was there discovery or wasn't there, I think I would like to refer you to particularly one piece of evidence in the record. It's C03846, if I'm reading it correctly. What it is is it's Michelle Larson, Rogers' in-house counsel in November, writing to her own counsel saying, we haven't had any discovery here. We've completely stood down in September and October, in the fall. We've had no discovery. So Rogers' own in-house counsel recognized the need to do discovery. That discovery was never, ever done. Instead, there was a settlement. What about the 150 hours that they keep talking about, where there was due diligence? So where's the 150 hours? None of it involved discovery. You've heard that concession. There was a lengthy trial record from years past, many years past. This case sat dormant for a long period of time that I would imagine Mr. Schultz is getting his arms around, and that's a pretty daunting task, getting your arms around a very large record from a very big case. But nothing was done with respect to that. Nothing was done with respect to particularly that key new evidence. Here's this guy Menzi, the sax person, who's now suddenly got some new story, from a scientific standpoint, that takes Schultz and Rogers to the death brief. That's a key thing that would necessarily need to be discovered. Why would we have seen a deposition in a brief? I was just going to ask, was Menzi's deposition taken? No deposition. I'm not certain with respect to the first case. I'm certain it was not with respect to the 2010 case. It was taken in the first case. I'm not certain, but certainly not with respect to this evidence, which is the thing that now is the only hook that Mr. Schultz has pointed to that said, okay, but I read dollar cash scripts in this case before, but this new hook, possibly, you know, there is a case. But that was never tested, and that certainly should have been tested. There was a statement that they didn't have to tell us about the $7.5 million negotiation that was done behind our back. You know, that's not a dead bang, singularly, end of the day fact. However, it's absolutely one of the factors, one of the red flags I've been talking about, It's also one of the red flags in the Fox case, that concealment, that's what they call it, concealment, that's exactly what was going on, concealment. That's a red flag of collusion. And it's when you add it up with the other facts here, the quickness of the settlement, the no discovery, the secretiveness of that, the way this is an allocated, highly structured settlement, which on its face is just completely offensive to think that you can take insurance money, you can pay for your own retrospective premiums. Retrospective premiums are part of the monetary exchange at the outset of a policy. You know, it's the formula. You can award yourself what you would owe in premiums by virtue of the natural effect of the monetary arrangement in the contract. You just unilaterally wipe out that part of the contract by awarding yourself that money. Counsel indicated there's nothing wrong with that, that it's done in settlements in the past. Are you aware of that? I'm aware of no settlement where that's ever happened. In CERCLA, you're not aware of those? This is a completely different realm. This is an insurance contract where after you pay, the insurer pays out a certain amount. But in the universe of CERCLA, you're claiming you're not aware of that? No, I am not aware of that in CERCLA. It wouldn't be in CERCLA. Right. Did you need some additional time? No, I think I'm good. Thank you, Judge. All right. Thank you. We appreciate the briefs and arguments of counsel and well-argued, and we will take the case under advisement. We're going to take a short recess and then continue the floor of argument.